John DAVIS, (Plaintiff) Respondent,

v.

WEIL CLOTHING COMPANY, a Corporation, and Edmund Osteryoung, (Defendants) Appellants.

No. 31180.

St. Louis Court of Appeals.
Missouri.

April 16, 1963.

Motion for Rehearing or for Transfer to Supreme Court Denied May 14, 1963.

Morton D. Baron, Baron & Freed, St. Louis, for appellants.

Thomas P. Howe, Dennis J. Quillin, John J. Stewart, Clayton, for respondent.

JACK P. PRITCHARD, Special Judge.

Defendants appeal from an adverse judgment upon verdict in this case of false arrest and imprisonment in the amount of $2,000 actual damages and $5,000 punitive damages, a total of $7,000. Defendants' after-trial motions for judgment in accordance with motions for directed verdict or for new trial were overruled.

The incident of the arrest and imprisonment here complained of by plaintiff arose initially out of a bogus "no account" check (plaintiff's Exhibit A) received by defendant, Weil Clothing Company, in its store on July 2, 1960, in the amount of $49.67, dated July 1, 1960, signed by a James Taylor, payable to a John Davis and endorsed "John Davis, 2305 Hood". The check was drawn on the Manufacturers Bank and Trust Company of St. Louis, and in the body thereof bore the check protector imprint, "United Surplus Mart, Inc. 49 DOLS 67 CTS". Defendant Osteryoung and defendant Weil, through other employees, did not know whether Weil Clothing Company paid cash for the check or whether it was for merchandise in whole or in part, or

went on a charge account. Weil had no store record on the transaction.

Weil's floor manager, defendant Edmund Osteryoung, one of whose duties it was to "okay" checks, did so on this check after the man presenting it apparently had endorsed it at a desk about four or five feet away from Osteryoung's usual stand. Osteryoung said he saw the man at the desk with a pen in his hand, but there was no way of telling whether he was writing or where he was writing. The man omitted the figures from the check, and upon request of the cashier Osteryoung inserted the figures "49/67".

The man who presented the check was, according to Osteryoung, dressed in an orange polo shirt; he looked tired, had a little dirty spot on his cheek, was a nice looking man, with sharp, prominent nose, was about six feet tall, and approximately a hundred seventy-five pounds in weight. He had brown hair. Osteryoung, at the trial, identified the plaintiff as the man who gave him the check.

Osteryoung also stated that he got no identification from the man who presented the check to him because he was fairly busy and was planning to take his vacation next day, that "I neglected to do the things I should have done and get the information."

Defendant Weil filed a counterclaim for the amount of said check, $49.67, against plaintiff, and the jury returned a verdict against the counterclaim, and there is no appeal from the judgment thereon.

The testimony of plaintiff reveals that on August 11, 1960, the day of the arrest and imprisonment, he was employed as a day bartender at Pub's Lounge, 5513 Pershing, St. Louis, Missouri, and on that day he got to work between 8:30 and 9:00 a. m., remaining on duty until somewhere around 12:30 or 1:00 p. m. He then went down-town to the Excise Commissioner's office at 204 Twelfth Street, across from the City Hall, in order to be fingerprinted as was required of all bartenders.

The lady in the Excise Commissioner's office gave him a letter which informed him to go over to the Police Station at 12th and Clark, where he was fingerprinted on his right hand, thumb and forefinger only, by an officer on the fourth floor, after which he went to the fifth floor for a records check. While there, the lady in Records got some cards and files and ran through them, saying, "Just a minute," and excused herself and went to the back of the room. Pretty soon a gentleman came up and asked plaintiff to step to the rear of the building, which he did. Plaintiff was asked to sign his name a few times, which he did as usually, "John E. Davis", and he was also asked to sign the name "James Taylor" three or four times. Plaintiff was asked if he had ever been arrested before, and he advised the officers that he had in 1956 or 1957 for an insufficient funds check. The gentleman then said, "Well, it looks like you have wrote other checks." This the plaintiff denied, and a few minutes later a Corporal Mahfood came up and plaintiff voluntarily went downstairs with him.

Corporal Mahfood, who was on the Check Squad of the St. Louis Police Department, then asked plaintiff if he cashed a check at Weil's Clothing Store, and plaintiff told him he had never been in Weil's and he definitely didn't cash a check there. Plaintiff requested that someone be called by telephone from Wiel's or he would even go over there, and let them identify him as the man who was supposed to have cashed the check at the store, and Mahfood made the telephone call.

Then Osteryoung came over to the Check Squad after Mahfood called the store, and when asked by Mahfood, "Do you recognize this man," he answered, "Yes, I do, he is the man that cashed this check at Weil's store." Corporal Mahfood then asked him, "Are you sure that's the man?" Plaintiff told Osteryoung that he had never been in Weil's, that plaintiff had never seen him

before, and he (Osteryoung) had never seen plaintiff before, and that there must be some mistake. Osteryoung said further, "I am sure he is the man, and I don't care what he says, he is the man that cashed the check in my store." Plaintiff "ranted and raved" and offered to take a lie detector test then, and offered to prove to Osteryoung where he, the plaintiff, was on July 2nd. And again Corporal Mahfood asked Osteryoung, "Are you sure this is the man who cashed the check, because," he said "if you are I am going to have to arrest him." Osteryoung answered, "Well, I am positive that's the man; regardless of what he says, I don't care, that's the man." Mahfood then told plaintiff he was going to have to place him under arrest, and Osteryoung left, having been at the police station a good thirty minutes.

Plaintiff was then arrested by Mahfood, booked, all of his fingers on both hands were printed, he was photographed and thereafter placed in a cell. He was released when his employer Mrs. Blackwell, sent a bondsman down to the jail at 10:30 that evening, and plaintiff paid the bondsman $50 for his service in furnishing the bond.

Concerning the events immediately preceding the arrest, Corporal Mahfood testified that Osteryoung told him plaintiff was the man who gave him the bad check; he was positive of the man because of his wearing a yellow or gold-colored shirt, a knit sport shirt. Plaintiff then denied it, and said he was working at the Pub Lounge at 5513 Pershing from 9:00 a. m. to 6:00 p. m. on the day the check was given at Weil's. Osteryoung on this occasion was informed by Mahfood that due to his identification he would have to place Davis under arrest, and also that Osteryoung would have to go with him (Mahfood) the next afternoon at a quarter to two, when "we would go to the Circuit Attorney's office to apply for a warrant." He made it clear to Osteryoung that due to the fact he was identifying Davis, Mahfood would have to place Davis under arrest. Plaintiff was arrested by Mahfood at 3:45 p. m.

Mahfood further testified that the next day he accompanied Osteryoung to the Circuit Attorney's office, where they conferred with Assistant Circuit Attorney Robert Koster, who asked Osteryoung if the man in the holdover was the same man who had given him the check, to which Osteryoung answered, "I think it is the man."

Plaintiff testified that later he employed a lawyer, Mr. Quillin, and agreed to pay him a fee of $300 to defend the matter of the bad check charge.

According to witness, Robert Koster, the warrant was refused by him as Assistant Circuit Attorney because Osteryoung expressed some doubt as to the identification of plaintiff as the man who presented the check at Weil's.

Plaintiff's employer, Elsie Blackwell, who operates the Pub Lounge at 5513 Pershing, testified that on the day the "no account" check was presented, July 2, 1960, plaintiff was employed by her as a day bartender, and she was in her place of business from after 12:00 to a little after 4:00 or 4:30 p. m., and plaintiff was also there all those times.

Mary Davis testified that in June and July, 1960, while she was employed by the Sixty-Six Warehouse Store, a division of United Surplus Mart, Inc., the store was burglarized and a book of counter checks and a check protector were stolen, these counter checks being of the same type as Plaintiff's Exhibit A.

Sol Zalbstein testified that a check (Plaintiff's Exhibit B) was passed at his employer's store, Golde's Department Store in Maplewood, of the same type as Plaintiff's Exhibit A, by a man with a ruddy complexion and dark brown hair, and that the plaintiff was not the man who cashed the check in his store.

Handwriting expert witness, George G. Swett, testified that these two checks, Plaintiff's Exhibits A and B, were written by one and the same person, and upon his comparison of plaintiff's handwriting and signatures

on cancelled checks of plaintiff with that on these two checks, it was his opinion that neither check was written by plaintiff.

With respect to how Osteryoung got over to the police station, the testimony of Osteryoung himself discloses that on August 11, 1960, Mr. Pultman (Secretary and Office Manager to Weil) came in and told Osteryoung that a Mr. John Davis was at the Check Squad and asked him if he would go down and try to identify him. Pultman told Osteryoung that the Police Department had called and asked him. Pultman told him to ask for Corporal Mahfood at the police station. Mahfood also testified that he called Weil Clothing Company and talked with Mr. Pultman and informed him that he had this Mr. Davis in his office; that there was a "wanted" card in the file by the name of John Davis, paying a check at Weil Clothing; and that he would like to have the check and all the parties concerned with the passing of the check in his office. He also informed Mr. Pultman that Mr. Davis was not under arrest, and would he hurry it up and send the people up as soon as possible, and Pultman told him he would. Osteryoung then came up to Corporal Mahfood's headquarters.

Despite Osteryoung's positive identification of plaintiff as the man who passed the check in Weil's Clothing Store, there was sufficient evidence that the jury reasonably could find, as it did, that plaintiff was not the culprit. Thus it would appear that plaintiff was subjected to a wrong by this identification.

With all of its attendant facts, circumstances, and legitimate inferences deducible therefrom, is this identification sufficient to sustain the judgment herein? Plaintiff contends that the "positive, unqualified and persistent identification" of him by defendant, Osteryoung, justifies an action for false arrest. He claims that the cases cited by defendants do not support the conclusion that a positive, unqualified, and definite identification of an individual, as the perpetrator of a criminal offense, to the police authorities, with knowledge that this act of identification will imminently cause the arrest to be made, does not constitute the encouraging or countenancing of an arrest. Plaintiff says further: "Here there is a most positive and repeated identification, here the identifier is specifically and directly advised as to the consequences of his act, here he rejects the opportunity to qualify his identification. * * * Using defendant's synonyms, he sanctioned, endorsed, and supported the arrest."

The cases in Missouri uniformly hold that in a case of false arrest and imprisonment the plaintiff must prove that defendants "directed, countenanced or encouraged," or "directed, countenanced, advised, encouraged or instigated the arrest. Heinold v. Muntz T.V., Inc., Mo.App., 262 S.W.2d 32, 35; Hoock v. S. S. Kresge Co., et al., Mo.Sup., 230 S.W.2d 758, 760 [affirming Hoock v. S. S. Kresge Co. et al., Mo. App., 222 S.W.2d 568]; Checkeye v. John Bettendorf Market, Inc., Mo.App., 257 S.W. 2d 202, 203; Snider v. Wimberly, 357 Mo. 491, 209 S.W.2d 239, 241; Vimont v. S. S. Kresge Co., Mo.App., 291 S.W. 159, 160; State ex rel. Fireman's Fund Insurance Co. v. Trimble, 219 Mo. 615, 242 S.W. 934, 935.

It is necessary again to define the referenced words in the above cases as such words may bear upon the facts of this case at bar. In Hoock v. S. S. Kresge Co., et al., Mo.App., 222 S.W.2d 568, 571, citing from Snider v. Wimberly, 357 Mo. 491, 209 S.W.2d 239, 242, the court stated:

"We have said that 'instigate' means 'to stimulate or goad to an action, especially a bad action'; and that 'one of its synonyms is "abet," which "means, in law, to aid, promote, or encourage the commission of an offense."' State v. Fraker, 148 Mo. 143, loc. cit. 165, 49 S.W. 1017, 1022; this definition has been followed in a malicious prosecution case, Hughes v. Van Bruggen, 44 N.M., 534, 105 P.2d 494. The applicable definition of 'countenance' is given by Webster's New In-

ternational Dictionary, 2d Ed., as 'to encourage, favor, approve' and its synonyms are given as 'sanction, endorse, support.' See discussion of this term in Vimont v. S. S. Kresge Co., supra [Mo.App., 291, S.W. 159]. Thus it requires something more than only furnishing wrong information, as the above authorities demonstrate, to amount to instigating, countenancing, advising or directing an arrest."

In Cooper v. Johnson, 81 Mo. 483, 489, a false arrest case, the court said, "That one was present and witnessed the trespass, but neither by word, sign nor act, nor in any other manner, signified his approval of it does not render him liable. He is not by his mere silence to be held as countenancing the act and jurors are supposed to know the meaning of ordinary English words, and not one of a hundred men of ordinary intelligence but knows that to 'countenance' an act means something more than to witness it. Webster defines the word: 'To encourage by a favoring aspect; to sanction; to favor; to approve; to aid; to support; to abet'. Mere approval of a trespass, after it is committed by one for whose benefit it was not committed, will not make him liable."

In Richardson v. Empire Trust Company, 230 Mo.App. 580, 94 S.W.2d 966, 971, the court stated: "One who merely gives information regarding an offense justifying arrest does not incur liability even though, in giving such information, he acts maliciously or acts without probable cause, unless he goes beyond such point and instigates the arrest by suggestion and encouragement and countenances it. * * * A cause of action for false imprisonment cannot be based upon a mere negation or failure to speak or act, but can only be based upon some affirmative act instigating thereto."

Plaintiff says that the case of Snider v. Wimberly, 357 Mo. 491, 209 S.W.2d 239, inferentially adopts the conclusion that the identification here is sufficient. We do not draw that conclusion from the Snider case. There, it is true, defendant said only that he *thought* plaintiff was the prowler, and by that statement he did not positively identify plaintiff as the prowler. But the evidence there was further that defendant did not "ever suggest, advise, direct or order" the arrest of plaintiff. The court held that these facts and the circumstances in connection with plaintiff's arrest were insufficient to show that defendant was responsible for it.

We think that the often cited case of Larke v. Bande, 4 Mo.App. 186, is close to the facts in the case at bar. There the defendant made a positive identification of plaintiff to the policeman by saying to him, "This man is trying to pass a ten-dollar counterfeit bill on me." There was no express request or direction to the officer to make the arrest. The court held that as a matter of law, plaintiff was not entitled to recover.

■ The well-established rule in Missouri is that the mere giving of wrong information to the police concerning a criminal offense, even though it results in an arrest, cannot be the basis for an action of false arrest and imprisonment. Hoock cases, supra; Snider v. Wimberly, supra; Heinold v. Muntz T.V., Inc., supra; Vimont v. S. S. Kresge Co., supra; State ex rel Fireman's Fund Insurance Company v. Trimble, et al., supra; Checkeye v. John Bettendorf Market, Inc., supra; Gould v. Skelly Oil Co., Mo.App., 50 S.W.2d 193; Larke v. Bande, 4 Mo.App. 186 (all cited by defendants). See also 35 C.J.S. False Imprisonment § 36, page 683, 21 A.L.R.2d 694, 710. The reason for this rule is well stated in Vimont v. S. S. Kresge Co., Mo.App., 291 S.W. 159, 160:

"* * * The rule is imminently founded on reason. To hold to the contrary would entirely destroy the right of the humble citizen, to whom the patrolman on the beat or the town marshal or village constable represents the majesty of the law and to whom for

many reasons the advice of counsel may be unavailable, to tell his troubles and difficulties to such officer, and to trust to the power and discretion of the legally constituted authorities to secure for him the rights which the law guarantees him."

We think that defendants' view is correct that the evidence here, on identification of plaintiff as the man who passed the bogus check, amounts only to the giving of information to the police officer. Defendant Osteryoung went to the police station at the request. of the police officer, Mahfood. Osteryoung never did request Mahfood to make the arrest. (Larke v. Bande, supra), and there was no evidence that he urged or advised the arrest, or that he took part in the questioning or holding of plaintiff, or that Mahfood was under his direction or was his agent. And after the arrest was actually made there was no affirmative act on Osteryoung's part to signify his approval. He went to the Circuit Attorney's office the next day to ask for a warrant with Corporal Mahfood and at his request. This court deems it of no vital importance that Osteryoung had it made clear to him the consequence of his act in identifying plaintiff, that Mahfood would have to arrest plaintiff, for the reasons that Osteryoung had a right to present this evidence to the police authorities, and Mahfood, in the performance of his duty as a police officer, had the right to require positive identification of plaintiff as the man who passed the check prior to the actual arrest. The evidence here is only that Mahfood made the arrest on his own initiative and judgment, after receiving the information from Osteryoung. Furthermore, knowledge that an arrest was imminent could properly be inferred in any case where any person merely makes an identification of an alleged offender.

We hold as a matter of law, therefore, that defendants did not "direct, countenance, encourage or instigate" plaintiff's arrest, and that the defendants' motion for directed verdict made at the close of all the evidence should have been sustained. It is unnecessary, then, to review other issues presented as to admissibility of evidence, agency, damages, and the propriety of instructions given.

The judgment is reversed.

WOLFE, Acting P. J., and ANDERSON, J., concur.

RUDDY, P. J., not participating.